## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| | § | |
| In re | § | **Chapter 11** |
| | § | |
| **NPC INTERNATIONAL, INC.,** | § | **Case No. 20–33353 (DRJ)** |
| *et al.*, | § | |
| Debtors.[1] | § | **(Jointly Administered)** |
| | § | |
| ---------------------------------------------------------- § | | **Adversary Proc. No. 20-03353 (DRJ)** |
| | § | |
| **NPC INTERNATIONAL, INC.,** *et. al.,* | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **McLane Foodservice, Inc.,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |
| ---------------------------------------------------------- § | | |

### AMENDED COMPLAINT FOR VIOLATION OF THE
### AUTOMATIC STAY, TO COMPEL PERFORMANCE OF
### EXECUTORY CONTRACTS, AND DECLARATORY JUDGMENT

NPC International, Inc. ("**NPC**") and its debtor affiliates, as debtors and debtors in

possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**" or "**Plaintiffs**"),

hereby file this *Amended Complaint for Violation of the Automatic Stay, to Compel Performance*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are NPC International, Inc. (7298); NPC Restaurant Holdings I LLC (0595); NPC Restaurant Holdings II LLC (0595); NPC Holdings, Inc. (6451); NPC International Holdings, LLC; (8234); NPC Restaurant Holdings, LLC (9045); NPC Operating Company B, Inc. (6498); and NPC Quality Burgers, Inc. (6457).  The Debtors' corporate headquarters and service address is 4200 W. 115th Street, Suite 200, Leawood, KS 66211.

*of Executory Contracts, and Declaratory Judgment* against McLane Foodservice, Inc. ("**McLane**")[2] and allege as follows:

## INTRODUCTION

1.      Through this adversary proceeding, the Debtors seek to enforce the fundamental protections afforded by the automatic stay and require the Debtors' critical food product supplier to perform under the terms of its executory supply contract.  McLane is the primary vendor through which NPC gets most ingredients for its Pizza Hut restaurants. Accordingly, stating that this relationship is critical is an understatement.  The Debtors purchase on average approximately $800,000 of product per day from McLane.

2.      The relief requested in the Amended Complaint is essential to preventing interference with a key asset of the Debtors' estate and goes directly to the fundamental protections afforded under the Bankruptcy Code.  The Debtors' ability to exercise their rights to reasonable, contractually bargained for trade terms is integral to the Debtors' financing of their chapter 11 cases.

3.      The Agreements (defined below) governing the business relationship between NPC and McLane provide for ▮▮▮▮▮▮ payment terms, meaning NPC must pay for goods within ▮▮▮▮ after they have been delivered by McLane to NPC's Pizza Hut locations. These agreements further provide ▮▮▮▮▮▮▮▮▮▮▮▮▮ if NPC chooses to pay for the delivered products prior to the ▮▮▮▮▮▮ term.

4.      Despite the clear ▮▮▮▮▮▮ term set forth in the Agreements and agreed to by McLane, McLane initially required (after Debtors' Chapter 11 filing) that NPC

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the *Declaration of Eric Koza in Support of the Debtors' Chapter 11 Petitions and First Day Relief*, sworn to on July 1, 2020 (Docket No. 4).

comply with ██████████████████████████████████████

███████████████████ or McLane would have stopped delivering food products to NPC's Pizza Hut locations.  McLane's unreasonable demands were and are in violation of the Agreements and the automatic stay, and are without justification.  The Debtors have attempted to resolve this matter consensually before requesting Court intervention despite there being no indication that NPC's continued payments to McLane are at risk.  Throughout the course of the relationship, the Debtors have always timely paid all invoices to McLane and have sufficient liquidity to continue to do so during the course of these Chapter 11 Cases.  Moreover, the Debtors have paid in full McLane's prepetition claim pursuant to the *Final Order (I) Authorizing Debtors to Pay Prepetition Claims of (A) Critical Vendors, (B) Lien Claimants, 503(b)(9) Claimants, and (D) PACA Claimants, (II) Granting Administrative Expense Priority Status for Outstanding Prepetition Purchase Orders; and (III) Granting Related Relief* (Docket No. 99) (the "**Vendor Order**"), and any postpetition amounts not paid in the ordinary course would nonetheless be entitled to administrative priority pursuant to section 503(b) of the Bankruptcy Code.  Even more, the Debtors purchase substantially all products used or sold in their Pizza Hut locations from McLane and do not have the practical ability to switch to another vendor.  The Debtors enjoy much more favorable terms from their other major partners, and in the Debtors' view is there simply no justification for the egregious terms McLane seeks to impose on the Debtors in violation of the automatic stay.

5.     Further, the ability of the Debtors to successfully reorganize depends on the ability to maintain adequate liquidity throughout the Chapter 11 Cases.  The Debtors' current liquidity forecasts are based, in part, on the assumption that the Debtors will be able to continue on reasonable terms with all of their vendors and exercise their contractual rights, such as the ██████████████████ terms under the Agreements, to maintain adequate levels of capital.  Adequate

liquidity is even more important due to the ongoing uncertainty surrounding the Debtors' business and the continuing impacts of the COVID-19 pandemic.

6.      Therefore, at this time, the Debtors believe that exercising their contractual right to ███████████ terms and forgoing the ████████████████ provided under the Agreements is in the best interest of the Debtors' estates and is the most reasonable use of their capital. Thus, this Amended Complaint seeks relief to enforce the automatic stay and require McLane to comply with its contractual obligations and make its required deliveries at the agreed-upon ███████████ terms under the Agreements.

## PARTIES

7.      Plaintiff NPC is the largest franchisee company in the United States, incorporated under the laws of the State of Delaware, with its principal place of business in Leawood, Kansas.

8.      Defendant McLane is a supply chain services company that distributes grocery and other products to convenience stores, retailers, quick service restaurants, and casual dining restaurants throughout the United States, with its principal place of business in Temple, Texas.

## JURISDICTION AND VENUE

9.      In this adversary proceeding, Plaintiffs seek: (a) damages in connection with McLane's violation of the automatic stay; (b) an order pursuant to sections 105(a), 362, and 365 of title 11 of the United States code (the "**Bankruptcy Code**") compelling McLane to comply with its contractual obligations and continue delivering goods already ordered in the ordinary course and delivering all new orders going forward on ███████████ payment terms as provided for in the Agreements; (c) a declaratory judgment, pursuant to  28 U.S.C. §§ 2201 and 2202, that any attempt by McLane to refuse to deliver goods pursuant to the Debtors' decision to exercise

their contractual rights to ▉▉▉▉▉▉ terms would constitute a breach of the MDA and Joinder Agreement, as well as the automatic stay; and (d) an order granting such other further relief as the Court may deem just and proper.

10.     The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b), and pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure and Rule 7008-1 of the Bankruptcy Local Rules for the Southern District of Texas, the Debtors consent to the entry of final orders or judgment by this Court in connection with this adversary proceeding if it is determined that, absent consent of the parties, the Court cannot enter final orders or judgments consistent with Article III of the United States Constitution.

11.     The Agreements also contain mediation and arbitration provisions that generally cover typical claims, disputes, or controversies arising out of the Agreements.  *See* MDA § 36; Joinder Agreement § 20.   These provisions, however, do not apply in this context. Bankruptcy Courts in the Fifth Circuit have discretion to decline to enforce an arbitration provision if (1) the proceeding derives solely from the provisions of the Bankruptcy Code; and (2) arbitration of the proceeding would conflict with the purposes of the Bankruptcy Code.  *See Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum),* 118 F.3d 1056, 1067 (5th Cir.1997).   This proceeding derives entirely from the Debtors' rights under sections 362 and 365 of the Bankruptcy Code.  Further, enforcing the arbitration provisions would conflict with the purposes of the Bankruptcy Code, including the goal of centralized resolution of purely bankruptcy issues.  *See Id*. at 1069.  Here, enforcement of the arbitration provisions would remove consideration of fundamental bankruptcy issues from the Bankruptcy Court, and create a

second forum in which these issues were adjudicated.  Accordingly, the Bankruptcy Court should

exercise its discretion to decline to enforce the arbitration provisions contained in the Agreements.

    12.  Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

**FACTS**

**A.**  **NPC's Business**

    13.  The Debtors commenced a voluntary case under Chapter 11 of the

Bankruptcy Code (the "**Chapter 11 Cases**") on July 1, 2020 (the "**Petition Date**").

    14.  The Debtors own over 1,600 franchised restaurants across two brands—

Wendy's and Pizza Hut[3]—spanning 30 states and the District of Columbia.  The Company has

approximately 7,500 full time employees and approximately 28,500 part-time employees across

both brands.

    15.  Specifically, as to Pizza Hut, the Debtors operate 1,227 Pizza Hut units in

twenty-seven states, with significant presence in the Midwest, South, and Southeast in both large

metro areas and "small towns."  The Debtors' Pizza Hut business employs approximately 24,000

employees.

    16.  All Pizza Hut product ingredients are prepared in accordance with

proprietary formulas established by the Pizza Hut Franchisor.  In addition, NPC Pizza Hut

restaurants utilize an approved purchasing and distribution network as required by the Pizza Hut

Franchisor.  The Company purchases substantially all food products required in the operation of

the Pizza Hut restaurants from McLane, and substantially all the supply chain and negotiation

activities are provided by Restaurant Supply Chain Solutions, LLC ("**RSCS**"), a cooperative set

---

[3] Solely for convenience, trademarks and trade names referred to herein may appear with or without the ® or ™ symbols, but such references are not intended to indicate in any way that the Debtors do not assert, to the fullest extent under applicable law, their rights or the right of the applicable licensor to such trademarks and trade names.

up to act as the central procurement service for the Pizza Hut Franchisor, which works in coordination with McLane. The predictable flow of ingredients and food products from McLane is critical to the Debtors' Pizza Hut operations. Indeed, without delivery of ingredients and food products, the Debtors' Pizza Hut restaurants would be unable to operate.

**B.      The Agreements Governing NPC's Relationship with McLane**

17.     McLane and RSCS are parties to the Master Distribution Agreement dated January 1, 2016 (the "**MDA**," a copy of which is attached hereto as "**Exhibit 1**"). The MDA governs the agreement between RSCS and McLane regarding McLane's distribution of food products, supplies, packaging, beverages, and other products to Pizza Hut retail locations, among other brands. *See* MDA. McLane and NPC are parties to the Participant Distribution Joinder Agreement dated August 30, 2016 (the "**Joinder Agreement**," a copy of which is attached hereto as "**Exhibit 2**," and together with the MDA, the "**Agreements**"). The Joinder Agreement incorporates the terms and conditions of the MDA (with certain exceptions not material here) and entitles NPC to all of the rights and privileges of the MDA. *See* Joinder Agreement.

18.     As relevant here, the MDA sets forth (i) the payment terms applicable to NPC; and (ii) McLane's Credit Policies. The payment terms agreed to between McLane and NPC are set forth on Schedule E-3 to the MDA. *See* MDA, Schedule E-3, attached hereto as "**Exhibit 3**" ("**Schedule E-3**"). Specifically, Schedule E-3 sets forth ██████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████. Schedule E-3 also sets forth ████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████      To date, NPC has elected to pay McLane under ████████████ terms,

which entitles NPC to ████████████████████.  Nothing in the ████████████ however,

requires NPC to take advantage of the ████████████████.

        19.    The Payment Terms set forth in Schedule E-3 are subject to NPC's

compliance with McLane's credit policies, as set forth in Schedule K to the MDA (the "**Credit**

**Policies,**" a copy of which is attached hereto as "**Exhibit 4**").  The Credit Policies provide, ████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████.  *See* Credit Policies.  The Credit Policies further

set forth the ████████████████████████████████████████████

████████████████████████████████████████████.  *See id.*

Finally, the MDA provides that McLane's Credit Policies ████████████████████

████████████████████████████████.

        20.    Throughout the term of the Agreements, NPC has remained in compliance

with McLane's Credit Policies to the best of the Debtors' knowledge and belief.  Moreover, outside

of the routine annual request for updated financial information from NPC, McLane has never

initiated a formal credit investigation to the Debtors' knowledge, and has never proffered any

evidence of credit analysis that would support interfering with the Debtors' right to elect ████

████████ terms under the Agreements.  In short, as the Debtors will be prepared to demonstrate to

the Court with evidence, the Debtors financial position is sound in these chapter 11 cases and

provides McLane with more than adequate assurance that it can repay the amounts due under its

contract with McLane.

**C.**    **McLane's Refusal to Comply with the Terms of the MDA or Joinder Agreement**

        21.    Notwithstanding the Debtors' continuing performance under the

Agreements, both prior to and following the Petition Date, McLane unilaterally imposed tightened

payment terms on the Debtors.  In correspondence from McLane to NPC on July 1, 2020, McLane advised that the "normal protocol with bankruptcies" is for McLane "to inactivate the stores immediately, and require prepayment via wire transfer to continue post-petition deliveries." McLane's unreasonable demand for NPC to make same day wire payments on the day products are delivered is a deviation from the parties' ████████████████████████████████ ████████████████████████████████.  Not only is same day payment unnecessarily burdensome on the Debtors (and contrary to the Agreements), but it requires the Debtors to forgo their ordinary invoice review and processing method that allows NPC to verify the accuracy of McLane's invoices.

22.     McLane continued to insist on same day wire payment for days after the Petition Date, advising NPC on July 1, 2020 that "[McLane] will reactivate the stores contingent upon your acceptance . . . that NPC's payment method will no longer be ACH, but will be wire transfer, and the wire transfer must be received on the day of delivery."  After considerable correspondence and discussion between McLane and NPC, NPC returned to the ACH payment method on July 10, 2020.

23.     Even more, following the Petition Date, McLane required each of the Debtors' individual Pizza Hut locations to alter their existing ordering accounts to "debtor in possession" accounts.  This required McLane to close the accounts for each location and initiate new accounts, a process that caused operational disruptions and confusion for the Debtors' Pizza Hut restaurants and NPC's back-office shared services personnel.  McLane's actions are in contravention of the agreed-upon terms of the Agreements and the Vendor Order, and entirely unreasonable, particularly in light of the Debtors' good faith attempts to work with McLane to ensure uninterrupted supply to their Pizza Hut restaurants.

24.     Following the Petition Date, the Debtors complied with McLane's unreasonable payment demands to ensure the Debtors' Pizza Hut locations would remain operational and able to serve their customers.  However, the Debtors, along with their advisors, have determined that it is in the best interest of the Debtors' estates and the best use of the Debtors' capital to exercise their contractual right to ████████████ terms as provided for in Schedule E-3 of the MDA.

25.     On July 20, 2020, the Debtors advised McLane of the Debtors' intent to pay on ████████████ terms as provided under the Agreements and no longer utilize the ████████████████████████.  The Debtors further assured McLane of the Debtors' intent to perform pursuant to the payment terms in the Agreements and make payment in full before the ████ ████ day following delivery of goods by McLane.  Indeed, the Debtors obtained approval for the consensual use of cash collateral to fund general working capital needs throughout the Chapter 11 Cases, including payments to McLane.  *See Interim Order (I) Authorizing the Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, and (V) Granting Related Relief*  [Docket No. 112] (the "**Cash Collateral Order**").   The Debtors' approved budget under the Cash Collateral Order provides for payments to McLane and reflects Debtors' intent to generate sufficient revenue from operations to fund the Chapter 11 Cases.

26.     In response to the Debtors' July 20 Letter, counsel for McLane indicated that it would dispute the Debtors' right to ████████████ terms because, in McLane's view, the MDA entitles McLane to determine credit terms and McLane believes the Debtors' estates are administratively insolvent.  McLane also reserved the right to delay or suspend shipment under

the contracts.  Following these initial exchanges, the parties engaged in discussions to come to an agreement on payment terms, but were unable to reach a resolution.

27.     In late 2019 McLane similarly denied NPC's attempt to exercise its contractual right to ██████████ terms and, instead, made onerous demands on NPC and threatened to stop shipments to NPC's Pizza Hut locations.  To prevent irreparable harm to NPC's businesses and avoid costly litigation, NPC was able to continue paying McLane on ████ ██████ terms while reserving all rights regarding McLane's failure to comply with the agreed payment terms set forth in the Agreements and its interference with the Debtors' rights to elect ██ ██████ terms in accordance with the Agreements.

28.     Given McLane's stated position, and the parties' inability to reach an agreement regarding a change in payment terms, the Debtors have decided to take a deliberate approach and not put their business at risk by McLane's threatened actions, and instead, seek a decision on the Amended Complaint in advance of taking payment terms.  Thus, pending the Court's determination of the relief requested in the Amended Complaint, the Debtors will continue to pay on the current payment terms to avoid irreparable harm and disruption to the business while this issue is resolved, with all rights reserved.

**D.     The Impact on the Company if McLane is Permitted to Impose Onerous Payment Terms or Refuse Delivery**

29.     It is undeniable that McLane's refusal to deliver food products to the Debtors' Pizza Hut locations would render the Pizza Hut restaurants unable to operate, forcing closure of the businesses and loss of employment for the Debtors' over 24,000 Pizza Hut employees.

30.     On the other hand, the onerous payment terms demanded by McLane are not necessary or reasonable (nor in compliance with the Agreements).  During these Chapter 11

Cases, the amounts owed to McLane for products delivered postpetition have been and will continue to be paid in the ordinary course and treated as administrative claims subject to priority. The Debtors' liquidity projections show that the Debtors are able to pay McLane for the products on a ███████ day basis during these cases.  In sum, McLane will suffer no harm and should be required to abide by the ████████████ term provided in the Agreements.

## RELIEF REQUESTED

### Count I: Violation of the Automatic Stay

31.     Plaintiffs incorporate paragraphs 1–29 as if fully set forth herein.

32.     Pursuant to Section 362 of the Bankruptcy Code, the filing of a bankruptcy petition operates as a stay, applicable to all entities, of any act to obtain possession of property of the estate, or to exercise control over property of the estate.

33.     The MDA and Joinder Agreement constitute valid, prepetition executory supply contracts. The rights pursuant to these executory contracts are property of the bankruptcy estate, and thus, are protected by the automatic stay from interference by other parties.

34.     McLane's refusal to supply the Debtors with goods pursuant to the terms of the Agreements and threat to terminate the Agreements based on the Debtors' decision to not utilize the ██████████████████ and, instead, utilize the contractual ██████████████ term—a material right the Debtors bargained for and are clearly entitled to elect—constitutes a violation of the automatic stay.

35.     The Debtors respectfully request the Court award damages in an amount to be determined as well as any other appropriate equitable relief the Court deems necessary.

### Count II:  Compel Performance Pursuant to Sections 105(a), 362, and 365 of the Bankruptcy Code

36.     Plaintiffs incorporate paragraphs 1–34 as if fully set forth herein.

37.     The MDA and Joinder Agreement constitute valid, prepetition executory contracts under which McLane is obligated to continue performing.

38.     The MDA and Joinder Agreement at issue here are executory contracts because material performance remains due on both sides: McLane has an obligation to deliver goods to the Debtors, and the Debtors have an obligation to pay for those goods.  Specifically, the Debtors are obligated under the MDA to ███████████████████████████████ ██████████████████████████ during the term of the Agreements, and McLane is obligated to timely deliver those products on an ongoing basis for the term of the Agreements. *See* MDA § 1(b).

39.     Pursuant to § 365 of the Bankruptcy Code, a debtor may elect to either reject or assume an executory contract. In the meantime, the non-debtor is bound by the contract's terms, which remain in effect.

40.     The Debtors have yet to decide which executory contracts it will assume or reject, meaning McLane is obligated to continue to perform under the Agreements by continuing to provide the Debtors with the food products, supplies, packaging, beverages, and other products necessary to continue the Debtors' business operations at the agreed upon payment terms.

41.     In accordance with McLane's performance, the Debtors have paid in full all postpetition amounts due to McLane and will continue to comply with their payment obligations under the Agreements for goods provided by McLane.  More specifically, the Debtors intend to pay for the goods within ███████ after they have been delivered, as set forth in Schedule E-3.

42.     Accordingly, McLane must continue honoring its obligations under the Agreements and McLane is prohibited from terminating or modifying those Agreements on the basis of the Debtor's bankruptcy proceedings or financial condition.

43.     Additionally, the Court's general equitable powers codified in section 105(a) of the Bankruptcy Code provide another basis to compel performance by McLane.  Section 105(a) of the Bankruptcy Code empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a)

44.     McLane's actions threaten both the Debtors' estate and reorganization prospects.  McLane's refusal to deliver food products to the Debtors' Pizza Hut locations would render the Debtors' stores inoperable, which in turn would impact service to the Debtors' customers, the livelihood of the Debtors' tens of thousands of employees, and the Debtors' ability to reorganize.  For these reasons, injunctive relief is appropriate in this case, and McLane should be enjoined from taking any action to interfere with the obligations set forth in the Agreements.

45.     Pursuant to sections 105(a), 362, and 365 of the Bankruptcy Code, the Debtors respectfully request that the Court issue equitable relief and order McLane to perform under its contractual obligations by (1) delivering goods already ordered in the ordinary course and (2) delivering all new orders going forward on ▮▮▮▮▮▮ payment terms as provided for in the Agreements.

### Count III: Declaratory Relief

46.     Plaintiffs incorporate paragraphs 1–44 as if set forth fully herein.

47.     Plaintiffs bring this cause of action to obtain a declaration that any attempt by McLane to refuse to deliver goods pursuant to the Debtors' decision to exercise their contractual rights to ▮▮▮▮▮▮ terms would constitute a breach of the MDA and Joinder Agreement, as well as the automatic stay.

48.     An actual, justiciable, controversy exists between Plaintiffs and Defendants as to whether McLane is obligated to continue to abide by the terms of the MDA and Joinder

Agreement and deliver goods following the Debtors' decision to exercise their contractual rights to ███████████ terms.  Accordingly, this Court has the power to adjudicate the rights of the parties with respect to this controversy and should grant declaratory relief under 28 U.S.C. § 2201.

WHEREFORE the Plaintiffs respectfully request that this Court: (a) award damages in connection with McLane's violation of the automatic stay; (b) issue equitable relief for Debtors through a decree ordering that, pursuant to sections 105(a), 362, and 365 of the Bankruptcy Code, McLane comply with its contractual obligations and continue delivering goods already ordered in the ordinary course and delivering all new orders going forward on ███████████ payment terms as provided for in the Agreements; (c) declare that any attempt by McLane to refuse to deliver goods pursuant to the Debtors' decision to exercise their contractual rights to ███████████ terms would constitute a breach of the MDA and Joinder Agreement, as well as the automatic stay; and (d) grant such other further relief as the Court may deem just and proper.

Dated:  August 26, 2020
         Houston, Texas

　　　　　　　　　　　　　　　　／s／ Alfredo R. Pérez
　　　　　　　　　　　　　　　　WEIL, GOTSHAL & MANGES LLP
　　　　　　　　　　　　　　　　Alfredo R. Pérez (15776275)
　　　　　　　　　　　　　　　　700 Louisiana Street, Suite 1700
　　　　　　　　　　　　　　　　Houston, Texas  77002
　　　　　　　　　　　　　　　　Telephone:   (713) 546-5000
　　　　　　　　　　　　　　　　Facsimile:    (713) 224-9511
　　　　　　　　　　　　　　　　Email:      Alfredo.Perez@weil.com

　　　　　　　　　　　　　　　　-and-

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (admitted *pro hac vice*)
John P. Mastando III (admitted *pro hac vice*)
Kevin Bostel (admitted *pro hac vice*)
Natasha Hwangpo (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:     (212) 310-8000
Facsimile:     (212) 310-8007
Email:       Ray.Schrock@weil.com
              John.Mastando@weil.com
              Kevin.Bostel@weil.com
              Natasha.Hwangpo@weil.com

*Proposed Attorneys for Debtors*

### **Certificate of Service**

I hereby certify that on August 26, 2020, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


   */s/  Alfredo R. Pérez*

## **Exhibit 1**

### **MDA**

This exhibit has been fully omitted due to confidentiality and will be filed under seal.

## **Exhibit 2**

### **Joinder Agreement**

This exhibit has been fully omitted due to confidentiality and will be filed under seal.

## **Exhibit 3**

**Schedule E-3 to the MDA**

This exhibit has been fully omitted due to confidentiality and will be filed under seal.

## **Exhibit 4**

### **Schedule K to the MDA - Credit Policies**

This exhibit has been fully omitted due to confidentiality and will be filed under seal