IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re | § | Chapter 11 |
| | § | |
| NPC INTERNATIONAL, INC., | § | Case No. 20–33353 (DRJ) |
| *et al.*, | § | |
| Debtors.[1] | § | (Jointly Administered) |
| | § | |
| -------------------------------------------------- § | | Adversary Proc. No. 20-03353 (DRJ) |
| | § | |
| NPC INTERNATIONAL, INC., *et. al.,* | § | |
| | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | |
| McLane Foodservice, Inc., | § | |
| | § | |
| Defendant. | § | |
| | § | |
| -------------------------------------------------- § | | |

**DEBTORS' OPPOSITION IN RESPONSE TO EMERGENCY MOTION OF MCLANE
FOODSERVICE, INC. TO (I) STAY DEBTORS' COMPLAINT FOR VIOLATION
OF THE AUTOMATIC STAY, TO COMPEL PERFORMANCE OF EXECUTORY
CONTRACTS, AND DECLARATORY JUDGMENT, (II) COMPEL
ARBITRATION, AND (III) SEEK RELATED RELIEF**

NPC International, Inc. ("**NPC**") and its debtor affiliates, as debtors and debtors in

possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**"), respectfully

submit this Opposition in Response (the "**Opposition**") to the *Emergency Motion of McLane*

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are NPC International, Inc. (7298); NPC Restaurant Holdings I LLC (0595); NPC Restaurant Holdings II LLC (0595); NPC Holdings, Inc. (6451); NPC International Holdings, LLC; (8234); NPC Restaurant Holdings, LLC (9045); NPC Operating Company B, Inc. (6498); and NPC Quality Burgers, Inc. (6457). The Debtors' corporate headquarters and service address is 4200 W. 115th Street, Suite 200, Leawood, KS 66211.

*FoodService, Inc. to: (I) Stay Debtors' Complaint for Violation of the Automatic Stay, to Compel Performance of Executory Contracts, and Declaratory Judgment, (II) Compel Arbitration, and (III) Seek Related Relief* [Docket Nos. 10 (redacted) and 13 (sealed)] (the "**Emergency Motion**").[2] In support, the Debtors state as follows:

### Preliminary Statement

1.       On August 3, 2020, the Debtors filed their Motion to Enforce the Automatic Stay and their Adversary Complaint, asserting claims against McLane Foodservice, Inc. ("**McLane**") for breach of the automatic stay and violation of an executory contract still subject to assumption, under §§ 105, 362, and 365 of the Bankruptcy Code.   The claims arise out of McLane's improper postpetition conduct—namely, its refusal to honor the Debtors' agreed-upon contractual payment terms under the Agreements and, instead, unilateral imposition of tightened payment terms on the Debtors.   In their filings, the Debtors seek relief only available under the Bankruptcy Code as to McLane's postpetition conduct.

2.       McLane responded with a flurry of filings over the course of several weeks, including the instant Emergency Motion.   In the Emergency Motion, McLane argues that the Debtors' claims and all issues related to McLane's improper conduct must be arbitrated, under the Federal Arbitration Act (the "**FAA**"), pursuant to a contractual arbitration clause contained in the Debtors' supply contract with McLane.   The Emergency Motion should be denied.

---

[2]  Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Emergency Motion, the *Debtors' Motion Pursuant to Sections 105(a), 362, and 365 of the Bankruptcy Code to Enforce the Automatic Stay and Compel Performance of McLane's Obligations Under an Executory Contract* [Bankr. Case No. 20-33353 Docket Nos. 348 (redacted) and 352 (sealed)] (the "**Motion to Enforce the Automatic Stay**") and the *Complaint for Violation of the Automatic Stay, to Compel Performance of Executory Contracts, and Declaratory Judgment* [Docket No. 1] [Adv. P. No. 20-03353] (the "**Adversary Complaint**").

3. Under Fifth Circuit precedent, this Court should deny arbitration, notwithstanding the FAA and any arbitration agreement between the parties, if: (1) the proceeding derives exclusively from the provisions of the Bankruptcy Code; and (2) arbitration of the proceeding would conflict with the purposes of the Bankruptcy Code. Here, both prongs are satisfied. *First*, the Debtors' claims arise solely out of McLane's postpetition violations of §§ 362 and 365 of the Bankruptcy Code, and seek relief solely under the Code. *Second,* requiring the Debtors to arbitrate their claims would conflict with key purposes of the Code because, as numerous courts have held, requiring arbitration of a claim for violation of the automatic stay presents an inherent conflict with fundamental protections afforded by the Bankruptcy Code. Additionally, McLane is the Debtors' largest vendor, and the executory contract at issue is one of the Debtors' most important contracts. Disputes related to this contract should not be relegated to a non-judicial body without bankruptcy expertise. As a result, arbitration should be denied under the governing legal standard.

4. Moreover, McLane improperly dedicates the majority of its Emergency Motion to arguing the merits of the underlying factual dispute, including an incorrect recitation of events that occurred over six months ago (all of which is irrelevant to this Court's analysis), in a meritless attempt to circumvent a simple application of the governing standard by attempting to reframe this as a dispute over a prepetition violation of the parties' contract, requiring adjudication of prepetition rights. McLane's argument should be rejected. The Debtors solely seek relief associated with McLane's postpetition conduct, and courts have made clear that the fact that bankruptcy claims concern a prepetition contract does not require them to be arbitrated. For these reasons, as set forth herein, the Emergency Motion should be denied.

3

## Relevant Background

5.      The Debtors' are the largest franchisee company in the United States, with franchised restaurants across two brands—Wendy's and Pizza Hut.[3]  *See Declaration of Eric Koza In Support of Debtors' Motion Pursuant to Section 105(a), 362, and 365 of the Bankruptcy Code to Enforce the Automatic Stay and Compel Performance of McLane's Obligations Under an Executory Contract* [Bankr. Case No. 20-33353 Docket No. 350] ("**Koza Declaration**" or "**Koza Decl.**") ¶¶ 3–4.[4]  The Pizza Hut Franchisor requires the Debtors to purchase substantially all food products required in the operation of their Pizza Hut restaurants from McLane.  *Id.* ¶6.  Without McLane's delivery of ingredients and food products, the Debtors' Pizza Hut restaurants would be unable to operate.  *See id.* ¶ 7.

6.      Two contracts govern the relationship between McLane and the Debtors: (1) a Master Distribution Agreement between McLane and Restaurant Supply Chain Solutions, LLC, a cooperative set up to act as the central procurement service for the Pizza Hut Franchisor (the "**MDA**"), which governs McLane's distribution of supplies to Pizza Hut retail locations, *id.* Ex. 1; and (2) a Participant Distribution Joinder Agreement between the Debtors and McLane (the "**Joinder Agreement**," and, together with the MDA, the "**Agreements**"), which incorporates the terms of the MDA (with certain exceptions not relevant here) and entitles the Debtors to all of the rights and privileges afforded under the MDA.  *Id.* Ex. 2.

---

[3] Solely for convenience, trademarks and trade names referred to herein may appear with or without the ® or ™ symbols, *but* such references are not intended to indicate in any way that the Debtors do not assert, to the fullest extent under applicable law, their rights or the right of the applicable licensor to such trademarks and trade names.

[4] To avoid burdening the Court, the Debtors have included only an abbreviated description of the facts concerning McLane's postpetition threats and actions in violation of §§ 362 and 365 of the Code, which are set forth in detail in the Debtors' Motion to Enforce the Automatic Stay and accompanying Koza Declaration, and in the Debtors' Adversary Complaint.  The Debtors include herein only those salient facts where necessary to support their argument.

7.     Under the Agreements, the Debtors must pay McLane for goods within ███ ███ after they have been delivered to NPC's Pizza Hut locations.  *See id.* Ex. 3 ("**Schedule E-3**").  The Debtors are also eligible for ████████████████████████████████████ ██████.  *Id.*  Contrary to McLane's unsupported allegations that they "put" the Debtors on ████████ ████████ prepetition (*see* Emergency Motion at ¶ 14), in fact it was NPC that elected to pay McLane under the ████████████ terms, which entitles NPC to ████████████ ██████.  *See* Koza Decl. ¶ 11.  These payment terms are subject to the Debtors' compliance with McLane's credit policies set forth in Schedule K to the MDA.  *See id.* Ex. 4 (the "**Credit Policies**").  Throughout the term of the Agreements, the Debtors have remained in compliance with McLane's Credit Policies to the best of their knowledge and belief.  *See* Koza Decl. ¶ 13 & Ex. 3 (Schedule E-3).  McLane has never initiated a formal credit investigation to the Debtors' knowledge, and has never proffered any evidence of credit analysis that would support interfering with the Debtors' right to elect ████████ terms under the Agreements.  *See id.*

8.     On July 1, 2020 (the "**Petition Date**"), the Debtors commenced their voluntary cases under Chapter 11 of the Bankruptcy Code (the "**Chapter 11 Cases**").  Immediately thereafter, McLane began threatening and taking actions against the Debtors in violation of §§ 362 and 365 of the Code.  Indeed, the parties' postpetition correspondence, which the Emergency Motion neglects, undermines any alleged notion that McLane has acted in "good faith."  *See* Emergency Motion ¶ 17.  For instance, McLane advised the Debtors on the Petition Date that, because of their Chapter 11 Cases, McLane intended to—and ultimately did—"inactivate the [Debtors'] stores immediately, and require prepayment via wire transfer to continue postpetition deliveries."  *See* Koza Decl. ¶ 14 & Exs. 5–6.  By unilaterally imposing payment terms far stricter

5

than the ████████ term allotted under the Agreements, McLane disrupted the Debtors'
operations by forcing Debtors to forgo their ordinary processes for reviewing invoices for
accuracy.  *Id*.[5]  McLane further disrupted the Debtors' operations at a critical juncture (*i.e.* the
outset of Chapter 11), and in so doing violated § 362 of the Code, by forcing the Debtors' Pizza
Hut stores to terminate then-existing ordering accounts in favor of new "debtor in possession
accounts."  *See* Koza Decl. ¶ 15.

        9.     McLane's Emergency Motion tries to whitewash this postpetition
misconduct by arguing that, ultimately, Debtors have no right to ████████ terms because,
in McLane's subjective view, the MDA entitles McLane to unilaterally dictate credit terms, and
because McLane believes the Debtors' estates are administratively insolvent.  *See* Koza Decl. ¶
18.  As a result, McLane has threatened to delay or suspend shipment of goods to the Debtors if
they fail to pay according to McLane's burdensome demands.  *See id*.  If acted on, McLane's
threats would render the Debtors' Pizza Hut restaurants inoperable, forcing closure of the
businesses and potential loss of employment for the Debtors' Pizza Hut employees.  *See id*. ¶¶ 16,
20; Adversary Complaint ¶ 29.  To avoid this untenable result, pending relief from this Court and
subject to a full reservation of rights, McLane has left the Debtors no choice but to comply with
its extra-contractual and overly stringent postpetition payment demands.  *See* Adversary
Complaint ¶¶ 27, 28.

---

[5] The demand for payment via wire transfer also represented a change from the parties' regular practice of using the
████████████████. *See* Koza Decl. ¶ 14.  *Id*.  After considerable correspondence and
discussion between McLane and the Debtors, the Debtors returned to the normal ACH payment method on July 10,
2020.  *Id*.

10.     On August 3, 2020, the Debtors filed their Motion to Enforce the Automatic Stay and the Adversary Complaint.  The Motion to Enforce the Automatic Stay asks the Court to provide relief under the Bankruptcy Code by enforcing the automatic stay and compelling McLane to comply with the terms of the Agreements by, *inter alia*: (1) continuing to deliver goods already ordered in the ordinary course; and (2) delivering new orders going forward on ███████ payment terms as provided for in the Agreements, rather than under McLane's new, improperly stringent terms.  *See generally* Motion to Enforce the Automatic Stay at 12.  The Adversary Complaint also seeks relief under the Bankruptcy Code.  Specifically, the Adversary Complaint asks the Court for the same relief requested in the Motion to Enforce the Automatic Stay, *see* Adversary Complaint ¶¶ 36–42; as well as damages for McLane's violation of the automatic stay, *see id.* ¶¶ 31–35; and a declaration that any refusal by McLane to deliver goods based on the Debtors electing ████████████ terms would violate the automatic stay and the Agreements. *See id.* ¶¶ 46–48.

11.     McLane responded with a flurry of *seriatim* filings.  First, on August 7, 2020, McLane filed its Emergency Motion to "(A) consolidate duplicative litigation under Fed. R. Bankr. P. 7042 and 9014(c) and L.R. 9013-1; (B) deny the motion to compel performance as unripe; or alternatively (C) enter a scheduling order Under Fed. R. Bankr. P. 7016 and 9006(b); and (D) granting related relief" (the "**Motion to Consolidate**"). *See* ECF No. 389.  In the Motion to Consolidate, McLane improperly asks the Court to, *inter alia*: (i) consolidate the Motion to

Enforce the Automatic stay **into** the Adversary Proceeding; (ii) dismiss the Motion to Enforce the Automatic Stay as unripe; and (iii) dismiss the Adversary Complaint. *See id.*[6]

12.     Before expiration of the Debtors' time to respond to the Motion to Consolidate, McLane filed this Emergency Motion on August 14, 2020. In the Emergency Motion, McLane argues that the Debtors must arbitrate their requests for relief under §§ 362 and 365 of the Code because of the arbitration clause in § 20 of the Joinder Agreement, which provides:



13.     The Debtors opposed McLane's Motion to Consolidate on August 21, 2020. *See* Bankr. Case No. 20-33353 Docket No. 479. Hours later, McLane filed yet a third emergency

---

[6]   At the August 25, 2020 conference, the Court rejected McLane's suggestion that the Motion to Enforce the Automatic Stay and Adversary Proceeding are identical. *See* 8/25/20 Tr. at 29:25–30:7 ("I don't think that they are exact duplicates of each other given the way that they currently exist? And so...I would answer the motion like you would any other motion pursuant to the rules. And I would deal with the issue with the adversary the way you would with a standalone adversary. And again, because I don't think they're duplicates, I don't think that that one will cover them both.").

motion in three weeks, this time to withdraw the reference to this Bankruptcy Court of all proceedings related to its violations of §§ 362 and 365, including the instant Emergency Motion, as well as the Debtors' Motion to Enforce the Automatic Stay, the Adversary Complaint, and McLane's Motion to Consolidate.  *See* Docket No. 17 and Bankr. Case No. 20-33353 Docket No. 481.  The Debtors' Opposition to the Motion to Withdraw the Reference is filed contemporaneously herewith, pursuant to the Court's order at the August 25, 2020 conference.

<u>**Argument and Authorities**</u>

I.     **The Court Should Deny McLane's Demand for Arbitration Because the Debtors' §§ 362 and 365 Claims Derive Exclusively from the Bankruptcy Code and Arbitration of Those Claims Would Conflict with the Purpose of the Bankruptcy Code**

       15.     As set forth in detail in the Adversary Complaint and Motion to Enforce the Automatic Stay, McLane's postpetition denial of the Debtors' right under the Agreements to ███ ███████ terms violates the automatic stay under § 362 of the Bankruptcy Code, and McLane's threats to terminate the Joinder Agreement—an executory contract—pending the Debtors' decision to assume or reject that agreement violates § 365 of the Bankruptcy Code.  *See generally* Adversary Complaint; Motion to Enforce the Automatic Stay.  Notwithstanding McLane's disagreement over the Debtors' right to ████████████ terms, the Debtors' rights violated by McLane derive exclusively from the Code, and arbitrating those violations conflicts with the purposes of the Code, thus this Court should deny the motion to compel arbitration.

    A.     **The Court Should Apply the *Gypsum* Standard to Deny Arbitration of the Debtors' Motion to Enforce the Automatic Stay and Adversary Complaint**

       16.     The standard used to decide a motion to compel arbitration during bankruptcy proceedings is set forth in *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos*

*Claims Mgmt. Corp. (In re Nat'l Gypsum Co.)*, 118 F.3d 1056, 1067 (5th Cir. 1997).  Under that standard, whether arbitration should be compelled depends on "the underlying nature of the proceeding," meaning (1) "whether the proceeding derives exclusively from the provisions of the Bankruptcy Code," and (2) if so, "whether arbitration of the proceeding would conflict with the purposes of the Code."  *Id*.  As the Fifth Circuit has repeatedly explained (including in a December 2019 opinion affirming this Court in denying a motion to compel arbitration), the *Gypsum* standard acknowledges that while the Federal Arbitration Act (the "**FAA**") requires enforcement of arbitration agreements, the FAA's "mandate may be overridden by contrary congressional command" such as the Bankruptcy Code. *Henry v. Educ. Fin. Serv. v. Henry (In re Henry)*, 944 F.3d 587, 589–91 (5th Cir. 2019) (affirming this Court and holding that the *Gypsum* standard still applies following the Supreme Court's 2018 decision in *Epic Systems Corp. v. Lewis*, 138 S. Ct. 1612 (2018)); *see also In re Gandy*, 299 F.3d 489, 494–95 (5th Cir. 2002) (citing *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226 (1987)).

    **B.**    **The First *Gypsum* Prong is Satisfied Because the Debtors' Alleged Claims for Violations of §§ 362 and 365 based on McLane's Postpetition Misconduct Derive Exclusively from the Code**

       17.    The first *Gypsum* prong is satisfied here because the proceedings derive exclusively from the Bankruptcy Code—specifically, they arise out of McLane's postpetition violations of §§ 362 and 365 of the Code, and seek relief for such violations provided by the Code. It is well-settled that a debtor's allegations that a creditor's postpetition actions violate the automatic stay will satisfy the first *Gypsum* prong.  *See Rushing v. Green Tree Servicing, LLC (In re Rushing)*, 443 B.R. 85, 96–97 (Bankr. E.D. Tex. 2010) (denying arbitration because the "complaint alleging stay violations under § 362(k) arises exclusively under the Bankruptcy Code"

and "is within the core jurisdiction of the Court"); *Walker v. Got'cha Towing & Recovery (In re Walker)*, 551 B.R. 679, 694 (Bankr. M.D. Ga. 2016) (denying arbitration because, "[i]f the allegations in the Complaint are proven true, this case presents a flagrant stay violation and a disregard for the authority of this Court"); *see also In re Jorge*, 568 B.R. 25, 37 (Bankr. N.D. Ohio 2017) ("[V]iolations of the automatic stay are within the substantive rights granted by the Bankruptcy Court and should not be sent to arbitration.").  Moreover, in applying the *Gypsum* standard, the Court is to accept the Debtors' factual allegations as true.  *See, e.g.*, *Henderson v. Legal Helpers Debt Resolution (In re Huffman)*, 486 B.R. 343, 349 (Bankr. S.D. Miss. 2013) ("For purposes of the Motion [to Compel Arbitration and to Stay Adversary Proceeding Pending Arbitration], the Court accepts all factual allegations in the Complaint as true".); *Elite Precision Fabricators, Inc.*, *v. General Dynamics Land Sys., Inc*., No. H-14-2086, 2015 WL 9302843, at *11 (S.D. Tex. Dec. 18, 2015) (adopting the *Huffman* standard); *accord In re Gandy*, 299 F.3d at 497 ("*assuming the facts to be well pleaded*, Debtor asserts bankruptcy causes of actions . . . that are in essence created by the Bankruptcy Code for the benefit of creditors of the estate") (emphasis added). Here, the Debtors have alleged facts showing that McLane has refused to comply with its contractual obligations under the Agreements and has, instead, imposed stringent payment terms with no contractual basis.  In addition to violating the automatic stay, McLane's actions violate § 365 of the Code because the Agreements are executory contracts that McLane must honor according to their terms, and cannot terminate, pending the Debtors' decision to assume or reject. *See* Motion to Enforce the Automatic Stay ¶¶ 34–36.  As such, the first *Gypsum* prong is satisfied here.

> C.     **The Second *Gypsum* Prong is Satisfied Because Arbitrating McLane's §§ 362 and 365 Violations Would Defeat the Code's Aim of Safeguarding the Core**

11

**Protection Afforded by the Stay and Place the Future of a Critical Estate Asset Beyond the Court's Required Expertise**

18.     The second *Gypsum* prong is likewise satisfied here.  Requiring the Debtors to arbitrate their efforts to enforce the automatic stay and obtain compliance with the Bankruptcy Code would conflict with key purposes of the Code because, *inter alia*, "[e]ntitlement to remedies by those protected constituencies for violation of the essential protections provided by the automatic stay goes to the heart of the bankruptcy process and should be safeguarded in a centralized forum.  A bankruptcy court is the best-equipped forum in which to evaluate the significance and impact of any alleged stay violation." *In re Rushing*, 443 B.R. at 97.  Indeed, in the *Rushing* case, the court held that "enforcement of the arbitration clause as against Debtor's automatic stay violation claim would inherently conflict with the federal statutory policies undergirding the significance of the automatic stay to the bankruptcy system and the protection afforded to constituencies benefitted thereby." *Id.* at 97–98.  By entering Chapter 11, the Debtors availed themselves of critical protections not available prepetition, and the violations of those protections arise exclusively under the Code and must be litigated with the benefit of this Court's expertise.  *See, e.g.*, *In re Gandy,* 299 F.3d at 494; *In re Rushing*, 443 B.R. at 97.  Arbitrating the Debtors' claims would conflict with the Code's emphasis on safeguarding in a centralized forum the crucial protections that the stay affords.  *Id.*  Further, McLane is the Debtors' largest vendor, and the MDA and Joinder Agreement are among the Debtors' most important (if not *the* most important) contracts.  *See* ¶ 3 *supra; see also* Motion to Enforce the Automatic Stay ¶¶ 3, 28 (identifying impact of the Debtors' liquidity on reorganization, and impact of the Agreements' payment terms on the Debtors' liquidity).  Under prevailing precedent, the future of this contract should not be "relegated to a non-judicial body unlikely to have bankruptcy expertise[.]" *In re*

*Hemphill Bus Sales, Inc.*, 259 B.R. 865, 871–72 (Bankr. E.D. Tex. 2001) (declining to compel arbitration, noting that the "agreement results in 90% of [Debtor's] business and [] without the Distribution Contract, the estate is eviscerated and reorganization would be impossible").[7]

## II.   McLane Cannot Avoid Litigating in this Court By Disputing the Merits of its Misconduct or Focusing on Prepetition Relations to Distract the Court from McLane's Postpetition Violations of §§ 362 and 365

### A.   McLane's Longwinded Effort to Dispute the Facts of its Misconduct Does Not Impact the Debtors' Right to Litigate Under *Gypsum*

19.     McLane attempts to circumvent the simple application of the *Gypsum* standard in its motion in several ways.  First, it improperly uses its Emergency Motion to argue the underlying merits of the Debtors' Motion to Enforce the Automatic Stay and Adversary Proceeding.  As a factual matter, McLane disputes the Debtors' right to ▮▮▮▮▮▮▮▮▮▮▮ terms, and argues that because on its own version of the facts, no plausible violations of §§ 362 or 365 have occurred in its mind, arbitration is appropriate.[8]  McLane's approach fundamentally errs,

---

[7] In its Motion to Consolidate, McLane implicitly acknowledges that the Debtors' claims under §§ 362 and 365 should be heard by the Court.  In that motion, McLane states, "dual tracking the requested relief creates the possibility that the Complaint is addressed by an arbitral panel or the district court, whereas the [Motion to Enforce the Automatic Stay] is not."  Motion to Consolidate at ¶ 22.  At minimum, this acknowledges that the Debtors' § 362 claim belongs in this Court, procedural vehicle aside (i.e., contested matter versus adversary proceeding).  As such, the stated risk of "inconsistent rulings" and "thorny issue and claim preclusion problems" arise only if the Court orders arbitration in addition to admittedly mandatory litigation over the automatic stay.  Any such order, however, would necessarily violate *In re Nat'l Gypsum* by failing to "protect creditors and reorganizing debtors from piecemeal litigation." *Gypsum*, 118 F.3d at 1069.  Further, simultaneously litigating McLane's stay violation and arbitrating the Debtors' other claims would needlessly waste substantial Debtor resources better spent elsewhere, thus violating another core principal of the Code.  *Id.* at 1069 n.21 ("conservation of the bankruptcy estate assets are integral purposes of the Bankruptcy Code").  Thus, once parsed, the Motion to Consolidate weighs against moving any of the Debtors' claims to arbitration.

[8] For instance, in Sections II(B) and II(C) of its Emergency Motion, McLane vehemently asserts, in essence, it has full discretion to determine whether, and on what conditions, to afford Debtors ▮▮▮▮▮▮▮▮▮▮, which Debtors allege they enjoy as of right under the MDA.  *See, e.g.*, Emergency Motion ¶ 6 (Debtors must first comply with the four "C's" of McLane's credit evaluation process).  McLane further asserts that the Debtors' election to pay for goods within ▮▮▮▮, rather than under the same-day terms imposed by McLane, constitutes a breach of the Agreements—thereby giving McLane an excuse for failing to comply with its own obligations under Section 365 of the Bankruptcy Code.  *See id.* ¶¶ 32–36.  This entire train of argument, however, is a red herring: as discussed below, any purported factual dispute is irrelevant to the *Gypsum* test, where instead the Court must accept *Debtors'*

13

however, because courts do not adjudicate the merits of the parties' underlying dispute when ruling on a motion to compel arbitration. As noted above, when applying the *Gypsum* standard, the Court is to accept the Debtors' factual allegations as true, and to avoid ruling on the merits of the claims. *See In re Gandy*, 299 F.3d at 496 (applying the *Gypsum* standard "[a]ssuming the facts to be well-pleaded, and without evaluating the merits of any claim")*; see also In re Huffman*, 486 B.R. at 349; *Elite Precision Fabricators, Inc.*, 2015 WL 9302843, at *11. As such, McLane's misrepresentation of the facts—including its incorrect allegation that the Debtors "breached" the Agreements, and therefore cannot compel McLane's performance under Sections 362 or 365 of the Bankruptcy Code—is irrelevant to this Court's arbitration decision.

20. McLane also misconstrues the governing statutes. For example, McLane argues that the Bankruptcy Code does not give the Court authority to provide the remedies sought by the Debtors for violation of the automatic stay. *See* Emergency Motion ¶¶ 37–46. This is legally incorrect.[9] Similarly incorrect is McLane's argument that it is absolved of any contractual obligations under Section 365 of the Code if the Debtors have not strictly complied with its new

---

*allegations* as true in determining if the rights McLane violated arise under the Code. As discussed above in Section I(B), the Debtors' allegations and claims for relief pass that test.

[9] *See, e.g., Broadstripe, LLC v. Nat'l Cable Television Coop. (In re Broadstripe), LLC*, 402 B.R. 646, 658 (Bankr. D. Del. 2009*), as amended* (Mar. 10, 2008) (issuing preliminary injunction preventing a creditor from ceasing to perform its contractual rights under a prepetition executory contract, finding that the debtor was likely to succeed on the merits of a claim seeking a declaratory judgment that doing so was prohibited by the automatic stay prior to assumption or assignment); *In re Lehman Bros. Holdings Inc.*, No. 08-13555 (JMP), 2009 WL 6057286, at *1 (Bankr. S.D.N.Y. Sept. 17, 2009). Additionally, McLane's motion completely ignores this Court's equitable powers under Section 105(a) of the Bankruptcy Code, which empower the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a). This authority offers a separate basis for the Court to enjoin actions which "might impede the reorganization process," as McLane's unilateral actions will here. *See FiberTower Network Servs. Corp. v. FCC (In re FiberTower Network Servs. Corp.)*, 482 B.R. 169, 182 (Bankr. N.D. Tex. 2012) (applying § 105 to enjoin the FCC from cancelling the debtor's licenses during bankruptcy proceeding).

same-day payment terms.  *See* Emergency Motion ¶¶ 32–46.[10]  In any event, these merits issues are not appropriate for consideration in the context of a motion to compel arbitration, and the Debtors reserve all rights to fully address McLane's merits arguments through briefing on their Motion to Enforce the Automatic Stay and in their Adversary Proceeding.

### B.   The Debtors are Entitled to Litigate McLane's Postpetition Violations of §§ 362 and 365 Even Though the Parties' Contractual Relationship Began Prepetition

21.   Apart from its improper and premature attempt to litigate the merits of the Debtors' claims, McLane also attempts to avoid simple application of the *Gypsum* standard— which would result in denial of its motion for the reasons set forth in Section I *supra*—by arguing that the "predominant and determinative issue" raised by the Debtors' filings is whether "McLane complied with the Agreements prepetition," which requires adjudication of the parties' "prepetition state law rights under the Agreements."  Emergency Motion  ¶¶ 1, 28.  In essence, and in what amounts to blatant bootstrapping, McLane argues that it is insulated from litigating its

---

[10] *See, e.g.*, *Krafsur v. UOP (In re El Paso Refinery, L.P.)*, 196 B.R. 58, 71–72 (Bankr. W.D. Tex. 1996) ("Until the court has affirmatively authorized rejection, the nondebtor party is not free to ignore the terms of the contract, and must continue to perform."); *In re Gunter Hotel Assocs.*, 96 B.R. 696, 700 (Bankr. W.D. Tex. 1988) ("an executory contract under Chapter 11 is not enforceable against the debtor party, but is enforceable against the nondebtor party prior to the debtor's assumption or rejection of the contract." (citation omitted)).  In attempting to distinguish the cases cited in the Debtors' Motion to Enforce the Automatic Stay, McLane's brief relies heavily on *In re Lucre, Inc.*, 339 B.R. 648 (W.D. Mich. 2006), an out-of-Circuit and inapposite case in which—before the debtor filed its bankruptcy petition—the debtor had already breached an agreement with a non-debtor service provider, a state court had already enjoined the service provider from discontinuing services pending resolution of the dispute, and the dispute had already largely been resolved by an order to pay for past services.  *Id.* at 650-51.  The Court granted limited relief from the stay for the service provider to resolve those issues arising out of the debtor's prepetition breach—distinguishing case law stating that a supplier must continue to perform obligations under an executory contact prior to assumption or rejection based on the fact of the Debtor's *prepetition* breach—but made clear that the automatic stay still prohibited the supplier from taking any action to terminate the contract.  *Id.* at 660-61 n.12. In additional to being non-binding on this court, *Lucre* is therefore distinguishable on key issues including the lack of prepetition breach by the debtors.

postpetition misconduct in the bankruptcy court because, prepetition, it also wrongly blocked Debtors from payment terms to which they were entitled under the MDA. *See id.* ¶¶ 9, 10.[11]

22.     This argument, too, is meritless.  As an initial matter, the Debtors' Motion to Enforce the Automatic Stay and Adversary Complaint do not seek relief for prepetition breaches of the Agreements by McLane, even if—as McLane suggests—such breaches occurred.  Rather, the Debtors' claims are asserted solely under the Bankruptcy Code, and only to obtain relief for *postpetition* violations of the automatic stay by McLane, and to prevent further violations during the bankruptcy proceeding.  *See* Section I *supra*.

23.     Moreover, a debtor's entitlement to litigate a claim for violation of the automatic stay under § 362 in bankruptcy court cannot be impaired simply because a creditor's actions in violation of the stay also breach a contract that was signed and partially performed prepetition.[12]  In *Rushing*, the court denied arbitration in exactly that situation, recognizing that "Debtor's cause of action [for violation of the automatic stay] against these two Defendants would not have arisen in the absence of the underlying debtor-creditor contractual relationship that the Debtor sought to adjust in his bankruptcy case," but finding the *Gypsum* factors nonetheless

---

[11] McLane claims that, "NPC acknowledges that McLane put or kept NPC on ███████████ and communicated that to NPC long before the Petition Date. Of course, the Debtors contend that this was done wrongfully and was a breach of the Agreements, but they do not dispute that basic fact." *Id.* ¶ 9. Going a step further, McLane also tries to weaponize against Debtors their prepetition business judgment–*i.e.*, ██████████████ ████████████████ as purported evidence that Debtors have forfeited any postpetition right to ████████████████ This argument fails, both because Debtors' reserved all rights and remedies with respect to the parties' prepetition payment term dispute, and because the Debtors are now in Chapter 11, where their business needs have changed. *See* Koza Decl. Ex. 9 (July 20, 2020 letter from Debtors to McLane explaining reservation of rights and change in business judgment during Chapter 11).

[12] As this Court recognized at the August 25, 2020 conference, relief for McLane's violation of the automatic stay under § 362 is available under § 105(a) of the Bankruptcy Code. *See* 08/25/20 Tr. at 23:15-20 ("362(k) only applies with an individual, but I can get to the same result through 105…that's the opinion that sits out there.  So I feel comfortable that I know how to do that.").

satisfied, as enforcing the arbitration clause would inherently conflict with the federal policies supporting the significance of the automatic stay to the bankruptcy process "and the protection afforded to constituencies benefitted thereby." 443 B.R. at 95, 98; *see also In re Caldor, Inc.-NY*, 217 B.R. 121 (Bankr. S.D.N.Y. 1998).[13]   Similarly, in *Gandy*, which involved a prepetition partnership dispute, defendants argued that arbitration should be compelled because "Debtor, in an effort to avoid arbitration, has 'window-dressed' her state law claims and artfully repled them as bankruptcy claims." 299 F.3d at 494.  The Fifth Circuit disagreed, holding that "[o]nce Debtor sought the relief afforded by Chapter 11 . . . she became a debtor in possession vested with certain statutory rights that empower her by virtue of the Bankruptcy Code to deal with [her] contracts and property in a manner [she] could not have employed absent the bankruptcy filing." *Id.* at 497– 98 (citation and internal quotation marks omitted).[14]

24.    Nor can a creditor compel arbitration by framing its violation of § 365 as a dispute over prepetition contract interpretation, as McLane attempts.  In *Hemphill Bus Sales,* 259 B.R. at 869, the court rejected precisely this argument, declining to compel arbitration of a dispute

---

[13] In *Caldor*, landlord overcharged for *prepetition* rent in breach of debtor's lease.  The Court acknowledged, "[landlord] is correct that [debtor] is seeking to redress alleged prepetition wrongs and that New York law governs the substantive merits of the parties' claims herein." *Id*. at 126.  Even though the crux of the debtor's claim alleged prepetition breach, the Court denied landlord's motion to compel arbitration because debtor's claim invoked the court's core function of determining objections to claims against debtor's estate.  *Id*. at 128.  As discussed below, Debtors do *not* seek relief for McLane's prepetition breach of the MDA; rather, they seek relief for McLane's postpetition refusal to honor the MDA's payment terms, and its threats to terminate or alter performance thereunder, all in violation of the Code.  If, however, this Court accepts McLane's clearly erroneous argument that Debtors seek relief for prepetition wrongs, *Caldor* nevertheless warrants denying arbitration.

[14] Courts in other circuits have reached similar conclusions.  For example, in *Cavanaugh v. Conesco Fin. Servicing Corp. (In re Cavanaugh)*, 271 B.R. 414 (Bankr. D. Mass. 2001), a debtor alleged that its mortgagee sought fees in violation of the stay.  The mortgagee moved to compel arbitration, arguing, "the issue before the Court is a simple one: whether or not CFSC was permitted to make such a charge under the Note and to list such on its invoices." *Id.* at 420.  The Court rejected mortgagee's effort to frame the dispute as a matter of contract interpretation, holding instead that debtor had alleged a substantive violation of a core bankruptcy right that must be litigated.  *See id.* at 425–26.

that arose prepetition over whether the debtor's distribution agreement with its supplier was validly terminated.[15]   As *Hemphill* explains, "[b]y filing its voluntary petition, the Debtor created an entirely altered legal landscape to that considered by the [two prior federal courts].   As of the commencement of this bankruptcy case, all of the Debtor's interest in the Distribution Contract vested in the bankruptcy estate."   *Id.* (internal citations omitted).[16]   Thus, *Hemphill* noted, "[a] determination as to whether the Distribution Contract was terminated and, ultimately, whether it may be assumed or rejected under [§ 365] for the benefit of the estate, involves a substantive right peculiar to the bankruptcy context which can neither be abrogated nor ignored."   *Id.* at 870.   As such, "the underlying nature of the dispute is not limited to a mere contractual dispute . . . as [supplier] has characterized it.   Rather, it is a matter involving both substantive rights and public policy that do not arise outside of bankruptcy law."   *Id.*   Finding that an alleged violation of § 365 satisfied the first *Gypsum* prong, the Court next determined that arbitration would conflict with the purposes of the Code, satisfying the second *Gypsum* prong, because, *inter alia*, "[d]isposition of such a significant asset is too critical to be relegated to a non-judicial body unlikely to have bankruptcy expertise[.]"   *Id.* at 872 (also noting that, as here, arbitration would impermissibly delayed reorganization since "arbitration is not at its conclusion, it is not at its apex, it has not even begun.").

---

[15] In *Hemphill*, the supplier "frame[d] the matter before this Court as merely one of state contract law and the Texas Motor Vehicle Code. [Supplier] then concludes that because the matter is one involving state law, the [FAA] must preempt the state law in this dispute."   *Id.*   Indeed, *Hemphill* denied arbitration even though, prepetition, federal courts in both Texas and Georgia had deemed the dispute arbitrable.   *See id.* at 866–67.

[16] Directly relevant to McLane, Debtors' largest vendor, *Hemphill* noted, "the interest of the creditors of this estate is quite relevant…given that the determination of the dispute directly affects the Debtor's ability to reorganize, [which] overrides either [supplier's] or the Debtor's individual rights under the arbitration clause."   *Id*. at 870.

25.     None of the cases cited in McLane's Emergency Motion compel a different result.  For example, in *In re Trinity*, one of the cases cited by McLane, the debtor's Chapter 11 plan had already been confirmed and, unlike here, the debtor had entirely ceased paying under the relevant contract and sought only postpetition damages.  In contrast, here, resolution of the Debtors' claims will have broad implications on their overall restructuring because McLane is the Debtors' largest vendor and the Agreements are key contracts in that relationship.[17]  *In re Trinity Communs.*, LLC, 2012 Bankr. LEXIS 1070 (Bankr. E.D. Tenn. Mar. 14, 2012).  The remainder of McLane's cited cases are equally inapplicable.  *See In re Great Spa Mfg. Co.*, 2009 Bankr. LEXIS 5568 (Bankr. E.D. Tenn. May 22, 2009) (granting a motion to compel arbitration and stay the adversary proceeding where, unlike here, the debtor conceded at argument that its adversary proceeding was neither core nor derived from any provision of the Code); *In re No Place Like Home, Inc.*, 559 B.R. 863 (Bankr. W.D. Tenn. 2016) (granting a motion to modify the automatic stay to permit arbitration where, unlike here, the debtors had already reorganized and did not assert claims under the Bankruptcy Code); *In re Nu-Kote Holding, Inc.*, 257 B.R. 855 (Bankr. M.D. Tenn. 2001) (awarding summary judgment and ordering arbitration for the same reasons); *In re Hydro-Action, Inc.*, 266 B.R. 638, 648 (Bankr. E.D. Tex. 2001) (finding no discretion to refuse to enforce arbitration provisions where, unlike here, debtor opposed arbitration based entirely upon the argument that its claims were "core," rather than on the *Gypsum* standard).

---

[17] For example, Debtors' right to ███████████ under the Agreements will significantly impact Debtors' liquidity, which is a key component to reorganization.  *See* Motion to Enforce the Automatic Stay ¶ 5 ("[T]he ability of the Debtors to successfully reorganize depends on the ability to maintain adequate liquidity throughout the Chapter 11 Cases. The Debtors' current liquidity forecasts are based, in part, on the assumption that the Debtors will be able to continue on reasonable terms with all of their vendors and exercise their contractual rights, *such as the extended payment terms under the Agreements*, to maintain adequate levels of capital.") (emphasis added).

26.     In short, because Debtors plead actionable violations of §§ 362 and 365 that are unique to the Code, and because the Code requires a bankruptcy court to safeguard those rights in a centralized forum, arbitration must be denied.

### Notice

27.     Notice of this Opposition will be served on any party entitled to notice pursuant to Bankruptcy Rule 2002 and any other party entitled to notice pursuant to Local Rule 9013-1(d).

### Certificate of Conference

28.     The Debtors conferred with McLane prior to filing this Opposition in an attempt to resolve the relief requested in the Emergency Motion and were unable to come to an agreement.

### Conclusion

29.     WHEREFORE the Debtors respectfully request the Court deny McLane's Emergency Motion and award further relief as the Court may deem just and appropriate.

Dated:  September 25, 2020
        Houston, Texas

/s/  Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
Alfredo R. Pérez (15776275)
700 Louisiana Street, Suite 1700
Houston, Texas  77002
Telephone:   (713) 546-5000
Facsimile:    (713) 224-9511
Email:      Alfredo.Perez@weil.com

-and-

20

WEIL, GOTSHAL & MANGES LLP
Ray C. Schrock, P.C. (admitted *pro hac vice*)
John P. Mastando III (admitted *pro hac vice*)
Kevin Bostel (admitted *pro hac vice*)
Natasha Hwangpo (admitted *pro hac vice*)
767 Fifth Avenue
New York, New York 10153
Telephone:    (212) 310-8000
Facsimile:    (212) 310-8007
Email:    Ray.Schrock@weil.com
    John.Mastando@weil.com
    Kevin.Bostel@weil.com
    Natasha.Hwangpo@weil.com

*Attorneys for Debtors*

**<u>Certificate of Service</u>**

I hereby certify that on September 25, 2020, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas.


<u>/s/ Alfredo R. Pérez</u>
Alfredo R. Pérez